[No. 831.]

## BISHOP AND CARPENTER, RESPONDENTS, v. JOHN STEWART, APPELLANT.

SALE OF PERSONAL PROPERTY—VERBAL CONTRACT BY VENDEE TO PAY DEBTS OF THE VENDOR—CONDITIONS OF SALE.—One McAvoy, having the possession of certain personal property, and being indebted to B. & C. in the sum of six hundred dollars and to S. in the sum of four hundred dollars, agreed to let S. have the property and to give him a clear title thereto if he would pay the debt due B. & C., sell the property and from the proceeds take out the debt of B. & C., his own debt, and pay the balance to McAvoy. S. agreed to this contract, provided no other person had any claim on the property conveyed. S. took possession of the property, and the next day was notified that McAvoy's title as to a portion of the property was not complete; that he had the privilege of making his title perfect by paying one Goldstone the sum of three hundred and seventy dollars. Whereupon he either made an effort to rescind the contract by informing B. & C. that he would not pay McAvoy's indebtedness to them, or elected to consider the contract rescinded by the terms thereof; but retained possession of all the property after full knowledge of Goldstone's claim, and under a new arrangement, in which B. & C. did not participate, he paid to Goldstone the amount due him, and took a bill of sale for the property from both McAvoy and Goldstone: *Held*, that S. could not, upon this state of facts, avoid the payment of the debt of six hundred dollars to B. & C.

CONTRACT—HOW RESCINDED.—A party cannot rescind a contract and at the same time retain possession of the consideration, in whole or in part, which he has received under it. He must rescind in *toto*, or not at all.

INSTRUCTIONS—WHEN NOT PREJUDICIAL.—Where, upon appellant's own showing of facts, the judgment, if rendered in his favor, would have to be reversed: *Held*, that the instructions given by the court, even if erroneous and contradictory, could not have prejudiced the appellant.

APPEAL from the District Court of the Sixth Judicial District, Eureka County.

The facts are stated in the opinion.

*Wren & Thornton*, for Appellant.

I. The verdict is contrary to, and unsupported by, the evidence, and is against law. The defendant is not liable, because if his promise be construed to pay his own debt to plaintiff out of the funds or goods of McAvoy, or to pay McAvoy's debt to plaintiffs out of McAvoy's goods, there must be a sufficient existing consideration between the plaintiffs and McAvoy on one side, and the defendant on the other. If McAvoy had no title certainly the consideration failed. This must also be the conclusion in the other aspect of the case, viz: that the promise of the defendant to the plaintiff and McAvoy was upon the condition that there were no other claims against the team, and that McAvoy could transfer the team clear. This is only the expression of what the law would imply; the fact being shown without any contradiction that both the express and the implied condition failed, the liability failed also. It is settled that upon a sale of personal property, a warranty of title is implied. (1 Parsons on Con., 456, 457.) A breach of such warranty may be a cause of action in itself, or may be pleaded in defense to an action for the price. (2 Kent's Com., pp. 651, 652, 653; 1 Story on Con., sec. 481, p. 583.) The reader must assume the burden of proof showing that the title of the adverse claim is paramount. (*Scott* v. *Scott's Adm.*, 2 A. K. Marsh. (Ky.) 218; *Payne* v. *Rodden*, 4 Bibb. (Ky.) 304; *Chandler* v. *Wiggins*, 4 B. Monroe (Ky.) 201.) The question whether a loss of the property by process of law was necessary to establish a failure of title, is immaterial in this case. It could only arise between the vendor of the chattel and an adverse claimant. The question was settled by the admission of Goldstone's title by all parties, including the plaintiffs, and its purchase by the defendant. If the plaintiffs had been the vendors of the team, suing for its price,

their admission of Goldstone's paramount title would have dispensed with the necessity of further proof. Goldstone had the title and right of possession, upon default of payment against the plaintiffs, McAvoy and the defendant. (*Cardinal* v. *Edwards*, 5 Nev. 36, and cases cited.)

II. The court erred in the second instruction to the jury, on behalf of plaintiff. The words "rescind the contract," may bear either of several instructions. If they mean that Stewart could not escape liability on his promise to the plaintiffs, whether that promise was absolute or conditional, the instruction is erroneous. If they mean that the defendant could not acquire the paramount title of Goldstone, and thus assert a failure of title and consideration between the plaintiffs and McAvoy on one side, and himself on the other, the instruction is incorrect. If the purchase had been fraudulent as between the defendant and McAvoy, the plaintiffs would have had no remedy. They had no lien by mesne, or final process, at the time of sale. If it should appear that the plaintiffs had intended to exhaust all legal remedies against McAvoy, yet without having obtained any lien, their loss is too remote, indefinite and contingent to be the ground of an action. No action lies in their favor for the infringement of such a shadowy right. (*Hutchins* v. *Hutchins*, 7 Hill (N. Y.) 104; *Stevenson* v. *Newnham*, 13 C. B. R. 285; *Moran* v. *Dawes*, Hopkin's Ch. R. 365; *Penrod* v. *Mitchell*, 8 Serg. & Rawle, 522; *Kelsey* v. *Murphy*, 26 Penn. St. 78; *Yates* v. *Joyce*, 11 Johns. 136; *Lamb* v. *Stone*, 11 Pick. 527; *Wellington* v. *Small*, 3 Cush. 145.) The same rule in regard to proof of failure of title, or breach of warranty of title, applies to both real and personal property. (*McGary* v. *Hastings*, 39 Cal. 360; *Bordwell* v. *Collie*, 45 N. Y. 494; *Burt* v. *Dewey*, 40 Id. 283; *Sweetman* v. *Prince*, 26 Id. 224; *Hamilton* v. *Cutts*, 4 Mass. 349; *Greenvault* v. *Davis*, 4 Hill, 643; *St. John* v. *Palmer*, 5 Id. 599.) The instructions of the court on behalf of the respective parties, are inconsistent and contradictory upon the real issues in the cause. This is such an error as to justify a new trial. (*People* v. *Valencia*, 43 Cal. 552.)

*Hillhouse & Davenport,* for respondents.

I.   The condition which is claimed by appellant to have been annexed to his promise to McAvoy, is immaterial, under the circumstances of this case and the facts proven therein, for the reason that such condition, if any there was, was never brought to the knowledge of the respondents until after they had acted upon the promise of appellant to McAvoy, and not until after they had lost the opportunity of securing their demand against McAvoy by allowing Stewart to take the property of McAvoy into his possession, which was done immediately upon the promise of Stewart, not only to McAvoy, but also to respondents.   The liability of appellant to pay the claim of Bishop & Carpenter against McAvoy being fixed, appellant could not relieve himself from such liability by subsequently rescinding the contract, even though he had a right to rescind, without notice to Bishop & Carpenter, and the return of the property to its original position.   Appellant could not, under the law, rescind the contract after respondents had acted on the promise made by him to McAvoy and Carpenter. (*Trimble* v. *Strother*, 25 Ohio St. 378.)   The promise of Stewart to McAvoy and Carpenter was binding upon Stewart.   (*Barker* v. *Bradley*, 42 N. Y. 316; *Barker* v. *Bucklin*, 2 Denio, 45.)

II.   The court did not err in giving the instructions asked for by respondents.   (*Bohall* v. *Diller*, 41 Cal. 533; *Purdy et al.* v. *Bullard et al.*, 41 Id. 444; Hilliard on Sales, pp. 262, 273, 278, 279; *Sweetman* v. *Prince*, 62 Barb. N. Y. 267–69; *Watts* v. *White*, 13 Cal. 321; *State* v. *McCauley*, 15 Id. 458; 52 N. Y. 403.)

III.   The appellant fails entirely to show any defense of any kind to the cause of action sued upon by plaintiffs. The answer, as originally filed, only denied the sale and the promise.   The amendment sets up a conditional promise, and an allegation that Goldstone made claim to the property.   The only cases that hold a vendee can, without returning the property or losing it at law, rescind the contract, is in cases where there was actual fraud.   (42 Barb. N. Y. 267.)   In this case no fraud is pleaded, none proven.

By the Court, LEONARD, J.:

On and before the twenty-second day of November, 1875, one John McAvoy was indebted to respondents, who were copartners, in the sum of six hundred dollars, for barley and hay sold and delivered. On the thirtieth day of November, 1875, respondents commenced this action, and in addition to the above facts, alleged in their complaint that on the twenty-second day of November, 1875, McAvoy, above-named, sold and delivered to defendant certain teams, to wit: ten horses and their harness, and three wagons, for which defendant, at the same time and place, agreed with plaintiffs and McAvoy, to pay plaintiffs on the following day the sum of six hundred dollars, United States gold coin, on account of and in settlement of the said demand due plaintiffs from McAvoy, and that no portion had been paid. Plaintiffs demanded judgment for six hundred dollars and interest from the date of the alleged sale and promise.

Defendant denied the sale, delivery and promise alleged, or that any sum was due from him to plaintiffs. At the trial, by leave of the court, defendant filed amendments to his answer as follows:

"Defendant, for a further defense, alleges that his promise to pay plaintiffs six hundred dollars of the amount due them from McAvoy, was upon the express condition that there was no third person who had any claim upon said property described in plaintiff's complaint; that said property was the property of one S. Goldstone at the time it was delivered to defendant by said McAvoy as aforesaid, and not the property of said McAvoy; that said Goldstone on, to wit: the twenty-second day of November, 1875, and the day after said property was delivered to defendant by McAvoy, claimed said property; whereupon said defendant informed said Carpenter of the fact of said claim, and informed him that he would not pay the said six hundred dollars to him; that by reason of the facts above set forth there was a total failure of consideration for said promise."

The cause was tried by a jury, who found a verdict for the plaintiff, as demanded in their complaint. Defendant

moved for a new trial. The motion was denied, and this appeal is taken from the order overruling defendant's motion, and from the judgment.

The record discloses these facts: On the twenty-second of November, 1875, the said McAvoy was indebted to respondents for barley and hay in the sum of six hundred and twenty-one dollars. He was on that day also indebted to appellant in something like four hundred dollars, upon a promissory note, for money loaned. He had in his possession certain teams, consisting of ten horses and mules with their harness and three wagons, with the usual accompaniments of such an outfit. As to six of the animals with their harness and two wagons, McAvoy, on the seventh of September, 1875, entered into a written agreement with Goldstone, their owner, the former agreeing to buy and the latter to sell the property last named for seven hundred dollars, which was to remain the property of Goldstone until paid for. Two promissory notes for three hundred and fifty dollars each, payable October 16 and November 16, 1875, respectively, were given by McAvoy to Goldstone, and it was agreed that the payment of the two notes should constitute payment for the team.

McAvoy was to have the use of the property during the time allowed him for payment, but the title was not to pass to him from Goldstone until full payment. Should McAvoy fail to pay the notes at maturity, it was agreed that Goldstone might take the property described in the written agreement from any person in possession of the same, and that any money paid less than the whole amount due should be considered and taken as "rent" for the use of the property; "provided however" (so it was stipulated) "that when the second note shall have become due and the said John McAvoy shall be unable to pay the same at maturity, then the said Sam Goldstone agrees to extend the payment of the said second note for the period of thirty days longer from the day of its maturity." McAvoy took possession of the six horses with their harness and two wagons mentioned in the agreement. There is no positive evidence that the first note was paid by McAvoy, but it seems to have been

for several reasons.  Appellant stated at the trial, that he settled Goldstone's claim on the team a day or two after his promise to pay respondent's bill, by paying between three hundred and fifty and three hundred and seventy dollars. McAvoy testified that Goldstone had a note against him at the time of his agreement with appellants and respondents, but he mentioned only one.   Goldstone testified that on the twenty-third of November, 1875, he released his claim upon the team to Stewart in consideration of the agreement of the latter to pay him the money due on the team.  So it *seems* that on the twenty-second of November, only the second note was unpaid, and that, under the written agreement, McAvoy had until the sixteenth day of December in which to pay the last note; that during such period he had a right to the use of the property the same as before, and the privilege of keeping the team as his own property by paying the amount due Goldstone.

There were *four* animals, with their harness, and one wagon, delivered by McAvoy to appellant, under the agreement stated in the pleadings, upon which neither Goldstone nor any person other than McAvoy had any claim.

Respondent Carpenter testified that on the twenty-first of November he went to see McAvoy in relation to the payment of the bill due from him to respondents; that McAvoy said he disliked to give up the team, because he wanted to use it; that witness told McAvoy respondents would give him thirty and sixty days further time, if he would get security.  McAvoy did not think he could furnish the security, and finally said he would turn over the team of four animals to respondents; that witness and McAvoy soon met appellant; McAvoy and appellant stepped aside and talked privately, and on their return, appellant asked witness how much of respondents' bill he would throw off, if appellant would pay it; that he agreed to deduct twenty-one dollars; that appellant then and there agreed, in consideration of the transfer of the team to him by McAvoy, to pay respondents their bill of six hundred dollars on the following day.

Both parties agreed that, in pursuance of the agreement, whatever it was, the whole outfit was delivered to appellant,

and that he continued to retain it after he learned of Gold-
stone's claim upon a portion thereof, and after informing
respondents that he would not pay their bill.

One or two days after refusing to pay respondents' bill,
appellant paid Goldstone between three hundred and fifty
and three hundred and seventy dollars, and received a bill
of sale of the whole team from both Goldstone and McAvoy;
nothing was paid to McAvoy.

As to the agreement, appellant testified as follows: "Some
time in November, 1875, Carpenter and McAvoy came to
my place. McAvoy took me to one side, and said he owed
Carpenter a barley bill, and he had no money to settle it;
that I had a note against him for five hundred dollars, and
that he would turn over the team to me if I would pay the
bill he owed Carpenter; that I could keep the team till spring,
and if I could sell it for more than would pay my bill and
the barley bill, to pay him the balance. *I told him I would
take it, provided nobody had any claim upon it.* He turned
the team over to me. The next morning I received a letter
from Mr. Goldstone, claiming the property he turned over
to me. * * * McAvoy assented to this agreement. I
told Carpenter the proposition McAvoy had made to me,
and asked him what he would take for his bill against Mc-
Avoy. He said he would take six hundred dollars. I told
him, provided the team was turned over to me, and was not
claimed by anybody, I would pay him; Carpenter said he
did not think there was any claim on it. I told him I did
not know."

Carpenter testified that there was no proviso in the prom-
ise made by appellant to pay the six hundred dollars. Mc-
Avoy testified: "I turned over to Stewart ten horses, three
wagons, harness, etc. I turned the stock over with the un-
derstanding that Stewart was to pay Bishop & Carpenter.
I don't know what he agreed to pay. I told him I owed
them six hundred and twenty-one dollars. He took the
property and retained possession of it. I asked Stewart to
take the stock and sell it, and to give me the remainder
that was over, after paying what I owed him, and this bill.
I was owing Stewart close on to four hundred dollars, and

the bargain between us was, that I should turn the stock over to Stewart, in consideration of his paying this bill, and then he was to sell it, and after paying what I owed him and Bishop & Carpenter's bill, he was to pay the balance to me. The understanding was, that I was to give him the property clear of all claims. Goldstone had a note against me, and I intended to get money due me in Secret Cañon, and pay Goldstone. Stewart did not know Goldstone had any claim against the property. Stewart may have said something about paying Carpenter, if there was no claim on the team. I calculated to give him a clear title to it. I do not recollect exactly what Stewart did say; I can not give his language. If a man speaks a little low, I can not catch his discourse; I am a little deaf. When Stewart agreed to pay Bishop & Carpenter's bill, he asked me if there was anything against the team. I told him I thought not; that I would make that all right—I would give him the team clear."

Goldstone testified that appellant said in the presence of Bishop & Carpenter, at their office: "The team is out there in the stable, and any one who claims it may go and get it." Bishop testified that he was present when Goldstone and Stewart came to the office of Bishop & Carpenter, and that Stewart did not offer to give up the team to him or anybody else. Carpenter testified that Stewart did not offer to give up the team to him.

Appellant testified that *he only offered to release the team Goldstone claimed;* that he told Goldstone *he would hold the four horse team for his indebtedness;* that there was no particular 'property' upon which he promised to pay respondent's bill; that no particular part of the property was turned over to him for any particular amount; that he had sold six horses and one wagon, for between six hundred and seven hundred dollars, and had two wagons, two horses and two mules left. There was no proof of the value of the property remaining in appellant's hands. The separate values of the Goldstone team, and the team owned by McAvoy, without incumbrance, do not appear. Carpenter valued the team at the time appellant

bought it, at sixteen hundred dollars; appellant considered it worth less than one thousand dollars; and McAvoy said it was not worth in the fall of 1875, as much as it was in the spring, but fails to state its value in the spring.

The foregoing is the substance of the evidence affecting this appeal. The case made by appellant's own proof is this: McAvoy was indebted to Bishop & Carpenter in the sum of six hundred and twenty-one dollars, and to him in the sum of four hundred dollars, or thereabouts. McAvoy agreed to let him have the whole property described, and give him a clear title thereto, if he would pay Bishop & Carpenter's bill, sell the team, and from the proceeds thereof, take out what he had paid Bishop & Carpenter, together with the amount of McAvoy's indebtedness to him, and pay any balance to McAvoy. Appellant agreed to this, provided no other person had any claim on the property conveyed. Under this agreement, the whole property was delivered to him, and on the following day he received notice for the first time, that as to six horses with their harness, and two wagons, McAvoy's title was not complete or perfect, but that he had a valuable interest in this portion of the property, to the extent of its use for the period of twenty-four days, and the privilege of making his title perfect by paying the sum of three hundred and seventy dollars. As to four horses, with their harness, and one wagon, McAvoy's title was perfect. Upon being notified that Goldstone had a claim against a portion of the property, he either made an effort to rescind the contract by informing respondents that he would not pay McAvoy's indebtedness to them, or he elected to consider it rescinded by the terms thereof, upon the theory that having made his promise, coupled as claimed, with the promise stated, his liability ceased when the condition failed as to part of the property. But whether he undertook to rescind by informing respondents that he would not pay only, or considered the contract rescinded by its terms, or as having never existed, because of failure of the proviso or condition, or by reason of partial failure of consideration, or on account of fraud; still, in either case, the result was that he retained possession of

all the property after ascertaining the extent and character of Goldstone's claim, and did not offer to return any portion to McAvoy, and in a day or two after its delivery, when cognizant of all the facts stated, he paid, under a new arrangement in which respondents did not participate, and to which they did not consent, about three hundred and seventy dollars to Goldstone, and received a bill of sale from both Goldstone and McAvoy.

Upon this state of facts alone, under the pleadings and proofs, independent of the evidence on the part of respondents that appellant's contract was without proviso or condition, and independent of the verdict of the jury upon that issue, it seems clear to us that appellant cannot, in this action, escape payment of the six hundred dollars to respondents.

It cannot be doubted that respondents can maintain this action, if McAvoy could have recovered in an action for the purchase-money, had the same been due to him, and had he seen fit to stand upon the first contract with appellant, instead of entering into another, at a subsequent date. (*Alcalda* v. *Morales*, 3 Nev. 137; *Barker* v. *Bucklin*, 2 Denio, 51; Pars. on Cont., vol. i, pp. 467–8.)

The learned counsel for appellant, urge three reasons why, in their opinion, the case should be reversed. We will consider them in their order.

Appellant's counsel urge that upon the facts proved, respondents were not entitled to judgment. At present, we shall consider this objection from the standpoint claimed by appellant, that the contract was coupled with the condition or proviso stated by him.

But when we speak of the contract we do not refer simply to the promise of appellant to pay respondents the six hundred dollars, provided there was no other person who had a claim on the property, but we mean the whole contract, including the proviso just mentioned; for there was but one contract, and that was entire. The consideration was entire on both sides. On the side of McAvoy, it was the whole team, with a warranty of title express and implied; on the part of appellant, it was an agreement to pay respondents'

bill of six hundred dollars, sell the team, and from the proceeds of its sale pay McAvoy whatever might remain, after deducting the barley bill and McAvoy's indebtedness to him, *provided nobody had any claim upon it.* Appellant's statement of the contract shows plainly that the proviso was attached to the entire contract, and not alone to his promise to pay respondents. Here it is: "McAvoy said he owed Carpenter a barley bill, and he had no money to settle it; that I had a note against him for five hundred dollars, and that he would turn the team over to me if I would pay the bill he owed Carpenter; that I could keep the team till spring, and if I could sell it for more than would pay my bill and the barley bill, to pay him the balance. *I told him I would take it, provided nobody had any claim upon it. He turned the team over to me.*" Conceding, then, that the proviso stated existed as to the entire contract, it was in the nature of a condition subsequent, which might, at appellant's option, avoid the agreement if it failed as to any part of the property, but the sale was complete, and McAvoy's title to the property passed to appellant at the time of delivery, notwithstanding the condition, and no one but appellant could complain or take advantage of its failure. (Story on the Law of Sales, p. 233, note 3; Id., p. 239, note; *Dorr* v. *Fisher*, 1 Cushing, 271.)

And although, *prior* to the contract and delivery of the property to appellant, respondents had no right in or claims upon it which hindered its *bona fide* transfer, yet the moment the agreement was made in part for the benefit of respondents, and the property delivered in accordance with its terms, they had fixed rights which could not be changed to their injury without their consent, except by acts of appellant, which alone, under the law, could relieve him from the burdens he had assumed.

McAvoy *might* have made a *bona fide* sale and transfer of the property, to the exclusion of respondents; but the fact remains that he *did not* do so. He protected them by the terms of the agreement, and applied six hundred dollars of the purchase-money to the payment of their claim. Therefore they had the right to reckon appellant's promise,

instead of McAvoy's indebtedness, as a portion of their assets, until appellant, by lawful means, should become relieved of the obligations he had assumed. It is necessary to ascertain whether or not appellant's acts were sufficient to entitle him to such relief, and consequently to a judgment in his favor in this case. It is important to keep in mind these facts: that the whole title of McAvoy, as well as all his rights and interests in the property, passed by delivery to appellant, and that, notwithstanding the proviso or condition, appellant could, at his option, waive the condition, retain the property and insist upon all the benefits to be derived from the contract after the condition failed; that at the time of the contract and delivery, McAvoy had a perfect title to four horses and their harness and one wagon, and that, in the balance of the property, he had valuable rights, to wit: its use for twenty-four days, and the entire property therein by paying, in the meantime, the sum of three hundred and seventy dollars. The whole property, then, was valuable, not only to McAvoy, but to appellant. It is difficult to see how the condition or proviso relied upon by appellant in this case differs from a warranty of title, or how, under it, he can claim any other or greater rights than he could have done had his plea been a breach of warranty, or fraud in the sale, with prayer for damages. For instance, A. has two teams. He says to B.: "This team is mine. I will sell it to you for one thousand dollars, and warrant the title." B. replies: "I will take it, if no one has any claim on it." A. assures him that his title is perfect. B. pays the purchase-money and the team is delivered to him.

A. then says to C.: "This team is mine; I will sell it to you for one thousand dollars and warrant the title." C. replies: "I will take it," and the team is thereupon delivered to him. In the first case, the vendee, in his acceptance, in terms expresses a condition, and in the last he does not. In each case there is an express and implied warranty of title, and in each the vendee takes the property with the understanding that he gets a clear title. Besides, the remedy of each is the same, in case of failure of title, in whole or in part.

Mr. Hilliard, in his work on contracts, vol. i, p. 140, says: "It is to be further remarked, with reference to the so-called *mutual* stipulations of the respective parties to the contract, that no subject has been more prolific of nice distinctions and conflicting decisions than that of the dependence or independence of such covenants."

The practical difference is expressed as follows: "When there is a stipulation amounting to a condition precedent, the failure of one party to perform such condition will excuse the other party from all further performance of stipulations depending upon such prior performance. But a failure to perform an independent stipulation, not amounting to a condition precedent, though it subject the party failing, to damages, does not excuse the party on the other side from the performance of all stipulations on his part." (*Mill Dam Foundry* v. *Hovey*, 21 Pick. 437; Story on Cont., vol. ii, 250; 3 Bing. N. C. 175.)

In *Kingston* v. *Preston*, Dougl. 690, Lord Mansfield says: "The dependence or independence of covenants is to be collected from the evident sense and meaning of the parties, and however transposed they may be in the deed, their precedency must depend upon the order of time in which the intent of the transaction requires their performance." So says, also, Sergeant Williams in *Pordage* v. *Cole*, 1 Wms. Saunds. 319, i, and adds: "If a day be appointed for payment of money or part of it, or for doing any other act, and the day *is* to happen, or *may* happen, before the thing which is the consideration of the money or other act is to be performed, an action may be brought for the money, or for not doing such other act *before* performance; for it appears that the party relied upon his *remedy*, and did not intend to make the performance a condition precedent; and so it is where no time is fixed for the performance of that which is the consideration of the money or other act.

And where a covenant goes only to a part of the consideration on both sides, and a breach of such covenant may be paid for in damages, it is an independant covenant, and an action may be maintained for the breach of the covenant on the part of the defendant, without averring perform-

ance in the declaration." The leading case upon the last point is *Boone* v. *Eyre*, 1 H. Bl. 273, note (a): The plaintiff conveyed to the defendant the title in equity of redemption of a plantation in the West Indies, together with a stock of negroes upon it, in consideration of five hundred pounds and an annuity of one hundred and sixty pounds per annum for life, and covenanted that he had good title to the plantation, was lawfully possessed of the negroes, and that the defendant should quietly enjoy. The defendant covenanted that the plaintiff well and truly performing all *and everything on his part to be performed, he, the defendant, would pay the annuity.*

The action was brought for the non-payment of the annuity. Plea, that the plaintiff was not, at the time of making the deed, legally possessed of the negroes, and so had not a good title to convey. In ruling upon the demurrer to the plea, Lord Mansfield said: "The distinction is very clear, where mutual covenants go to the whole of the consideration on both sides, they are mutual conditions, the one precedent to the other; but when they go only to a part where a breach may be paid for in damages, there the defendant has a remedy on his covenant, and shall not plead it as a condition precedent. If this plea be allowed, any one negro not being the property of the plaintiff, would bar the action."

And Sergeant Williams, in commenting on this case, remarks as follows: "The whole consideration of the covenant on the part of B., the purchaser, to pay the money, was the conveyance by A., the seller to him, of the *equity of redemption* of the plantation, and also of the stock of negroes upon it. The excuse for the non-payment of the money was, that A. had broken his covenant as to part of the consideration, namely, the stock of negroes. But as it appeared that A. had conveyed the equity of redemption to B., and so had, in part, executed his covenant, it would be unreasonable that B. should keep the plantation, and yet refuse payment because A. had not a good title to the negroes." (Parsons on Cont., vol. ii, 531, note, and 676–7; Story on Cont., vol. ii, 516 *et seq.*)

It is plain to our minds that the proviso claimed by appellant was not intended by the parties to be in the nature of a condition precedent. Appellants promised to pay respondents on a day certain, the day following the contract, which was wholly inconsistent with the idea that he should not pay until it should be shown beyond question that no other person had a claim upon the property. Certainly he knew that any claimant might not make his claim known before the time appointed for payment.

As before stated then, McAvoy's whole title and interest in the team passed, with the delivery, to appellant, whose liability to respondents then became fixed, and now remains, unless by his subsequent acts he was released.

Undoubtedly appellant had a right to claim a clear title to the property, and certainly, as between him and McAvoy, he had ample remedy, if the title failed in whole or in part. But in this case his remedy under the pleadings and proofs, is limited to one defense, which is a failure of the proviso or condition claimed, as a plea in bar of the action, and as a consequence, failure of consideration; he also asked, and received, favorable instructions on the question of fraud, although that defense is not directly pleaded.

There having been but partial failure of consideration, and the condition being subsequent, should it be admitted that appellant had a right to rescind the contract on the ground of fraud, or because of the failure of the condition, or for any other reason, still his privilege was, also, to waive the condition in his favor, or the fraud, and insist upon the remaining benefits of the contract; or he might, by his acts, forfeit his right to treat the contract as void. (Hilliard on Cont., vol. i, pp. 305, 333, 340; *Burton* v. *Stewart,* 3 Wend. 339; *Thayer* v. *Turner,* 8 Metc. 552; Benj. on Sales, 453; *Desha's ex'rs* v. *Robinson, adm'r,* 17 Ark. 240.) And in case of such waiver or forfeiture he would be held to the terms of the contract; that is to say, the fraud or condition subsequent would not bar the action, and his only remedy would be damages for breach of warranty, or fraud, under proper pleadings, in which case no return of the property would have been required.

Had Goldstone's claim on the team been ten dollars, instead of three hundred and seventy dollars, appellant could have paid that amount, kept the property, and looked to McAvoy for repayment, as in that case he probably would have done. So he could pay the three hundred and seventy dollars and keep the property as he did. But having done so, for the purposes of this action, the contract, as to respondents, was continued in force. There was nothing to hinder a return of the property to McAvoy, with the notice of such return to respondents, thus placing all parties in such a position that their rights and interests could be protected; but there should have been, and there was, much to prevent appellant from getting and retaining possession of all the property under the contract, and thereafter refusing to comply with his agreement to pay respondents.

No principle is better settled than that a party cannot rescind a contract and at the same time retain possession of the consideration, in whole or in part, which he has received under it. He must rescind *in toto,* or not at all. (*Jewett* v. *Petit et al.,* 4 Mich. 512; *Hendricks* v. *Goodrich,* 15 Wis. 679; *Sumner & Co.* v. *Parker,* 36 N. H. 454; *Webb* v. *Stone,* 24 N. H. 288; *Jennings* v. *Gage et al.,* 13 Ills. 612; *Stoddard* v. *Graham,* 23 How. Pr. 518; *Ogburn* v. *Ogburn,* 3 Porter, 129; *Desha's ex'rs* v. *Robinson, adm'r, supra; Reed* v. *McGrew,* 5 Ohio, 386; *Perley* v. *Balch,* 23 Pick. 285; *Minor* v. *Kelly,* 5 Mon. 274; *Barnett* v. *Stanton & Pollard,* 2 Ala. 189; *Cocke et al.* v. *Ruck's guardian,* 34 Miss. 109; *Utter* v. *Stewart,* 30 Barb. 20; *Clark* v. *Baker,* 5 Metc. 461; *Bryant* v. *Isburgh,* 13 Gray, 611; *Hunt* v. *Silk,* 5 East, 225; *Carter* v. *Harden & Walker,* 2 Rich. 46; *Christy* v. *Cummings,* 3 McLean, 386; *Bain* v. *Wilson,* 1 J. J. Marsh. 203; *Morse* v. *Brackett,* 98 Mass. 207; Story on Sales, 492 *et seq.;* Id. 505 *et seq.;* 2 Pars. Cont. 678; *State of California* v. *McCauley,* 15 Cal. 458.) In the case last cited the court, following a long line of decisions, refused to decree a right of rescission in the plaintiff, because the contract having been partially executed, and consequently there having been only a partial failure of consideration, the parties could not be replaced in their previous condition; and because the state did not offer to

make restitution of the property received. If the law refused relief to the vendee when he cannot restore the property to the vendor, unless the fault lies with the latter, it surely will not grant it to one who can restore the property, but will not.

In *Ogburn* v. *Ogburn, supra,* the court says: "As a vendee of a chattel, who has paid the purchase-money, cannot maintain an action to recover it back, for the want of title in his vendor, while he has and is in the undisputed possession of the chattel, how can one in the same circumstances prevent the recovery of the purchase-money? To sustain the defense would be a rescission of the sale. We think no defense can be made to an action for the purchase-money when the facts relied upon to make it would not, if the parties were changed, and the money had been paid, enable the vendee to recover it back for the breach of the warranty of title."

Had appellant paid McAvoy one thousand dollars in money for the property and received it under the same contract, or had that amount been paid by him to respondents in satisfaction of a debt due to them from McAvoy, it would not be seriously contended that it could be recovered back by appellant without returning, or offering to return, all of the property of any value to either party, received by him.

In *Thayer* v. *Turner*, 9 Metc. 552, it is said by Shaw, C. J., "that a sale made under false representations is not *ipso facto* void, but it is voidable at the election of the party defrauded. The vendor who has parted with his property upon such false representations, may insist that no title passed to the vendee or to any other person claiming under him, other than a *bona fide* purchaser for value, and without notice of the fraud. And in such case, the vendor may maintain replevin or trover for his property. But the rule thus laid down is always accompanied with this qualification, that the power of rescinding in the case stated, is at the election of the party defrauded. Although he is imposed on, he may keep the property and affirm the sale, or he may rescind at his option. But if he elects to rescind the sale, he must return and restore to the other party, the whole of the consideration, whether money, goods or securities re-

ceived by way of consideration for the sale, which may be of value to either party."

"A condition precedent corresponds to the suspensive condition of the civil and Scottish law, and a condition subsequent to the resolutive condition. Mr. Brown, in his Treatise on Sales, says: 'A condition resolutive, when it is accomplished, puts an end to the contract, but does not suspend its existence.'

The contract is perfect, notwithstanding the presence of a condition subsequent, and is merely liable to be rescinded on the condition being accomplished." (Story on Sales, p. 233, note 3.

And in commenting upon a contract of sale of hemp "on arrival" of a certain ship, the same author, p. 239, note, says: "The fairest interpretation of the contract would seem to be, that the sale was absolute, with a condition subsequent or resolutive; that is, it was a present sale, with the condition that if no hemp arrived, the sale was to be null. The condition was not precedent, for, provided the hemp had arrived, it would not have become the property of the vendee at the time of the arrival; but it would have been his property from the time when the note was given. It was not necessary before the property passed, that the condition should be performed, but it was agreed that, if a certain condition did not happen, the sale should thereby be defeated. In like manner a person would buy an article on a warranty, or on trial, and if the condition should fail, the sale would be avoided; but it would yet have been a complete sale; *so that if the vendee did not take advantage of the failure of the condition, no one could.*"

We are of the opinion, therefore, that the condition claimed is not a bar to this action; that by reason of appellant's failure to restore the property, the condition was waived, and his promise to pay respondent's bill of six hundred dollars, remains in full force. Having arrived at this conclusion from appellant's theory of the case, it is of course unnecessary to consider this objection in the light of respondent's proofs and the verdict of the jury.

It is next urged that the second and fourth instructions

for respondents, were erroneous, and that the instructions on behalf of the respective parties were inconsistent and contradictory upon the prominent legal issues of the case; and that the fact last stated, alone constitutes an incurable error.   We do not deem it necessary or advisable to prolong this opinion by a review of the several instructions, although we are satisfied that the instructions given for respondents were substantially correct in principle, and that the contradictions and inconsistencies claimed by counsel for appellant, arise from a view of the law too favorable for appellant, so far as is shown by the instructions given in his behalf.

We have seen that respondents were entitled to a verdict and judgment in this case upon facts admitted by appellant to be true.   Under such circumstances the court could not have refused to grant a new trial, if the verdict had been for defendant, and the instructions given could not have prejudiced appellant, even though they were erroneous and contradictory.   (*Green* v. *Ophir C. S. & G. M. Co.*, 45 Cal. 527.) The verdict and judgment should have been the same, had the instructions been correct and consistent with each other.

The order and judgment of the court below are affirmed.